UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X

RAMON ESPINAL,

        Petitioner,                   <u>MEMORANDUM AND ORDER</u>

  -against-                   Civil Action No.
                                  CV-00-1337 (DGT)(RLM)

FLOYD BENNETT,                CV-00-6536 (DGT)(RLM)

        Respondent.

-------------------------------X

Trager, J:

      Petitioner Ramon Espinal ("Ramon" or "petitioner")[1] is currently serving a sentence of 58 and 1/3 years to life, following his conviction at trial on two counts of murder in the second degree, for the shooting deaths of Wilfredo Garcia ("Wilfredo") and Alberto Montanez, and one count of attempted murder in the second degree, for the shooting of Jose Cortes ("Cortes"). Petitioner was also sentenced to a concurrent sentence of 5 to 15 years for criminal possession of a weapon.

      The events under review are not recent history. The shootings took place two decades ago, on the night of June 21, 1988 in Williamsburg, Brooklyn. Ramon was arrested a year later, on June 19, 1989. This case first went to trial in January 1991.

---

[1] Petitioner will be referred to as "Ramon" or by his full name in this opinion, to avoid confusion with his brother Reynaldo Espinal ("Reynaldo") who has also been implicated in these killings.

The first jury was unable to reach a unanimous verdict, and a retrial was ordered. The retrial commenced on March 25, 1991, and ended with a guilty verdict after three days of jury deliberation. Ramon was sentenced on April 29, 1991. Since that time, he has engaged in a series of direct and collateral attacks on his conviction in the state and federal courts.

This case is now before the court following petitioner's June 5, 2006 objections to the Corrected Report and Recommendation issued by Magistrate Judge Roanne L. Mann on May 23, 2006 (the "R&R"). Judge Mann has recommended that Ramon Espinal's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be denied, and that his case be dismissed. Petitioner objects on the ground that he received ineffective assistance of counsel that falls below the standard permitted by Strickland v. Washington, 466 U.S. 668 (1984).

Petitioner also claims that he is actually innocent of the crimes for which he is currently imprisoned and that he is entitled to habeas relief on a free-standing claim of actual innocence. The Second Look Program of Brooklyn Law School was granted leave to appear as amicus curiae on June 28, 2006. The Second Look Program has argued for petitioner's actual innocence, principally through its November 15, 2005 Memorandum to the Brooklyn District Attorney's office (the "Second Look Report"),

in which it documented its investigation into this case and offered evidence to support petitioner's alibi claims.

The evidence presented at trial was more than sufficient to allow a rational juror to find petitioner guilty of these crimes, and petitioner has failed to overcome this legal presumption of guilt. However, as explained below, the record viewed as a whole raises serious doubts about the defendant's actual guilt. Still, the record as it stands appears to be insufficiently strong to prove actual innocence to the degree that would be required should such a freestanding claim exist.[2] House v. Bell, 547 U.S. 518, 555 (2006) (discussing the evidentiary showing that would be required if actual innocence were a cognizable claim and declining to decide whether such a claim exists).

Nonetheless, petitioner has pointed to a constitutional claim supported by the record that cannot be dismissed as harmless. Principally, trial counsel's failure to explore and present available evidence - particularly counsel's failure to investigate a redacted police report that could have corroborated

_____

[2] Petitioner's new evidence largely consists of affidavits maintaining that he is actually innocent of these murders. Affidavit evidence collected years after a criminal conviction must "be treated with a fair degree of skepticism." Herrera v. Collins, 506 U.S. 390, 424 (1993) (O'Connor, J., concurring). But because petitioner is entitled to habeas relief on traditional Strickland grounds, there is no need to determine whether he could meet this standard for proving actual innocence, much less whether a free-standing claim for actual innocence exists.

3

petitioner's alibi – undermines confidence in the reliability of petitioner's conviction at trial. Unfortunately, the witness identified in the redacted report, David Garcia ("David"), is now dead. See July 17, 2007 Tr. at 9. As a result, a clear picture of these incidents may never emerge. But petitioner has sufficiently established that his trial counsel was ineffective, and that he was prejudiced by that ineffectiveness, to substantiate his claims under Strickland.

Accordingly, for the reasons explained below, Ramon Espinal's petition for a writ of habeas corpus is granted.

## Background

A detailed recounting of the facts and procedural history of this case can be found in the R&R at pages 1 to 23. Accordingly, only a short summary is recounted here. Record citations are provided for those facts which do not appear, or which are recounted somewhat differently, in the R&R, or which are relevant to petitioner's objections.

### Petitioner's Arrest for the June 21, 1988 Shootings

Petitioner's conviction stems from three shootings near the corner of South 1st Street and Bedford Avenue, in Williamsburg, Brooklyn, on June 21, 1988.  The victims included Alberto Montanez, a 15-year old boy who was shot in the face and subsequently died; Wilfredo Garcia, who was shot twice in the back and died about a week after the incident; and Jose Cortes, who was shot once in the right leg.  Petitioner was alleged to have been acting in concert with his brother, Reynaldo Espinal. Both Ramon and Reynaldo fled together to the Dominican Republic after the shootings.  Although Ramon returned to New York the following year, and was arrested soon thereafter, Reynaldo has apparently resided in the Dominican Republic ever since.

The record shows that police from the 90th Precinct immediately responded to these shootings, and that Detectives Stephen Chmil ("Chmil") and Peter Vitulli ("Vitulli") immediately commenced an investigation.  Petitioner, however, objects to the R&R's implication that Ramon Espinal was "immediately" identified as a suspect by police.  Pet.'s Obj. at 2-5.  Petitioner notes that on the night of the shootings police were canvassing local hospitals looking for "a male hispanic, light skinned, 5' 9", approximately 20 years of age seeking treatment for a gunshot

wound."  See Pet.'s Obj. at 2.[3]  Accordingly, petitioner argues

that police were only initially seeking his brother Reynaldo, who

fit that description.

Nonetheless, it remains clear that Ramon was identified as a

suspect early in the police investigation.[4]  The day after the

June 21, 1988 shootings, police interviewed the superintendent of

the apartment building at 155 South Second Street, where the

Espinal family resided.  The super told police that petitioner's

mother, Maximina Espinal, had told the super's wife that her

sons, Ramon and Reynaldo Espinal, were said to have killed three

people at the corner of Bedford Avenue and South Second Street,

and that they had left for the Dominican Republic.  On June 23,

1988, Detectives Chmil and Vitulli went to John F. Kennedy

Airport and confirmed that two passengers with the name "R.

Espinal" had purchased tickets in cash for a flight to Santo

Domingo that departed some six or seven hours after the

---

[3]     Police reports regarding the canvass of hospitals are
attached as exhibits to petitioner's first Section 440 motion,
dated October 30, 1996.  The full motion (including exhibits)
appears in the current record as Exhibit C to Respondent's
Affidavit in Opposition to Petition for a Writ of Habeas Corpus,
filed on April 3, 2001 ("RX C").
    To be consistent with the citation form in the R&R, all
documents appended as exhibits to Respondent's April 3, 2001
Affidavit will be cited as "RX" with the appropriate exhibit
letter.

[4] This investigation is recounted in more detail in the R&R at
pages 2 to 5.

shootings.  Accordingly, the police actually had reason to
believe that Ramon was involved prior to June 24, 1988, when an
unidentified individual told the detectives that he saw both
Ramon and Reynaldo Espinal pull up to the corner in a red car on
the night of the shootings.  See R&R at 4; Pet.'s Obj. at 4.[5]

Ramon was arrested for these shootings the following year,
on June 19, 1989, by Officer Louis Silva of the 67th Precinct.
Officer Silva was pursuing Reynaldo Espinal in connection with a
separate homicide investigation.  In the course of that
investigation he discovered Ramon hiding in a rear bedroom closet
in the Brooklyn apartment of Reynaldo's former girlfriend.

---

[5]     In addition, a news report published on June 23, 1988 (which
appears in the papers filed by Ramon's appellate counsel on
direct appeal) cites unnamed sources claiming that Alberto
Montanez was killed after "two men leaped from an auto and gunned
down two other male pedestrians at S. First St. and Bedford Ave.
After the shooting, the gunmen fled in the car."  Charles Seaton
and Joseph McNamara, Sweet teen is slain in his native city, New
York Daily News, June 23, 1988, attached as Ex. C to the Brief of
Defendant-Appellant Ramon Espinal, dated Mar. 29, 1993 ("RX A").
Although this news report is certainly not evidence of what
actually happened that night, it does suggest that police could
have been searching for two gunmen since the start of their
investigations.
    Detective Robert Alongi has also told the Kings County
District Attorney's Office that "street intelligence" informed
him on the night of the shootings "right away that it was Ramon
and his brother Reynaldo who had shot these three individuals."
July 17, 2007 Tr. at 42.  Detective Alongi was a 90th Precinct
police officer and member of the Eastern District of New York's
DEA Task Force at the time.  See Mar. 17, 2008 Tr. at 3; Guzman
2005 Statement ¶ 3.

Several hours later, at the 90th Precinct, Detectives Chmil and Vitulli interviewed petitioner, who was then 17 years old, after advising him of his Miranda rights. In the police report filed after the interview (known as a "DD-5 report"), Detective Chmil summarized Ramon's statement as follows:

> Last year when the two guys were shot at South 1 & Bedford Ave. I was driving a red Firebird in the area of South 4th & Havemeyer. I saw my brother come running up South 4th St. He got in the car and told me some guy was shooting at him at South 1 & Bedford Ave. and the guy shot him in the hand, it was wrapped in a bandage. He told me he shot the guy that shot him in the hand. We then drove home to 366 Decatur St. The next day we left the country for Santo Domingo. About eight months ago I came back to New York.

DD-5 report for Ramon Espinal, attached as Second Look Rep. Ex. A.

At approximately 4:00 a.m. the following morning, petitioner was interviewed on videotape by Assistant District Attorney Allan Lewis and Detective Vitulli. Ramon, who was again given Miranda warnings, reiterated the substance of his statement to the Detectives. He again stated that he had encountered his brother near the corner of South 4th and Havemeyer after the June 21, 1988 shootings had taken place. During this interview, Ramon added that he was drag racing down Havemeyer when he saw his brother, and that the drag race was against two friends whom Ramon had encountered at a nearby gas station earlier that

evening.  See transcription of June 20, 1989 interview with Ramon
Espinal, attached as Second Look Rep. Ex. A.

**(2)**

### Petitioner's Trial and Conviction

At a pretrial suppression hearing, privately retained
defense counsel Barry Krinsky ("Krinsky"), moved unsuccessfully
to suppress petitioner's post-arrest statements on the grounds
that they were the tainted product of a warrantless arrest
without probable cause and that the statements were not knowing
or voluntary.  Subsequently, petitioner went to trial in January
1991 before Justice Harold Fertig of the New York Supreme Court,
Kings County.  This jury was unable to reach a unanimous verdict.
According to Krinsky, the first trial jury split ten to two in
favor of acquittal.  H. Tr. at 168-69.[6]

Ramon's retrial began on March 25, 1991, with Justice Melvin
S. Barasch presiding.  On retrial, the prosecution presented a
somewhat modified theory of the case.  During Ramon's first
trial, the prosecution argued that Ramon was a shooter along with
his brother Reynaldo.  See Tr. at 237.  The prosecution witnesses
at the first trial included Edwin Rodriguez, who testified that

---

[6] To be consistent with the R&R, the transcripts of petitioner's
pretrial hearings in state court, along with his retrial, will be
referred to collectively as Transcript ("Tr.").  The transcript
of petitioner's post-conviction evidentiary hearing, held on
January 14, 1998, will be referred to as "H. Tr."  Any citations
to transcripts of other hearings will include the hearing date.

he saw Ramon and Reynaldo shoot Wilfredo Garcia and two other individuals.  Statement of Edwin Rodriguez, dated May 20, 2005, attached as Second Look Rep. Ex. B ("Rodriguez Statement") at ¶ 2.  According to Krinsky, Rodriguez's testimony was "riddled with inconsistencies," and the jurors who voted for acquittal at the first trial were strongly influenced by Rodriguez's lack of credibility.  H. Tr. at 170.  Rodriguez did not testify at the second trial, and he now claims that he lied at the first trial in order to receive a reduced sentence on a then-pending robbery case.  Rodriguez Statement ¶ 3.  At the retrial, lacking any eyewitnesses who claimed to have seen Ramon shooting, the prosecution instead argued that Ramon should be found guilty of these murders because he was acting in concert with his brother Reynaldo.  See Tr. at 240, 702-04.  On summation, the prosecution also suggested that the evidence could reasonably support an inference that Ramon was not only armed but was also a shooter. See Tr. at 705-07.

At the second trial, the prosecution presented two eyewitnesses to the shootings.[7]  The first, Anthony Jose Garcia, testified that he saw both Ramon and Reynaldo Espinal take part in the shootings.  Anthony Garcia previously sold crack cocaine

---

[7]  The prosecution's case is summarized more fully in the R&R at pages 8 to 15.  Both of these eyewitnesses, Anthony Garcia and Jose Cortes, also testified at the first trial.

10

for Ramon and Reynaldo Espinal at the corner of South 1st and
Bedford Avenues, but had stopped working for them after a fist
fight with Ramon over comments made to Garcia's girlfriend.  Tr.
at 453-54.[8]  At the time of his testimony, Garcia was serving a
sentence of six months of "basic training" in a military-style
boot camp program for selling drugs and violating probation.

Garcia testified that he saw Reynaldo Espinal and Wilfredo
Garcia arguing about neighborhood drug sales on the afternoon of
June 21, 1988.  Id. at 461-62.  That evening, Garcia saw Ramon
and Reynaldo cruising around the neighborhood of South 1st Street
and Bedford Avenue in a red Trans Am.  Id.  at 464.  After they
drove past Wilfredo Garcia and Jose Cortes walking toward South
1st and Bedford, Ramon and Reynaldo parked their car and got out
holding firearms.  Id. at 469-70.  Garcia saw Reynaldo open fire
toward Wilfredo and Jose Cortes "without saying a word."  Id. at
469.  Garcia testified that he did not see Ramon open fire, but
that Ramon was instead standing behind Reynaldo with his gun
"pointed toward the floor."  Id. at 471.  Garcia then heard
another shot and saw a "young kid," Alberto Montanez, collapse.
Garcia did not see who shot Montanez.  Id. at 472-73.  He then
observed the Espinal brothers run back to their car and drive

---

[8] On March 10, 1988, Garcia had been shot in the right ankle by
Reynaldo Espinal at this corner due to an unidentified dispute.
Tr. at 454.

away, with petitioner in the driver's seat and Reynaldo as a passenger.  <u>Id.</u> at 474.

On cross-examination, defense counsel introduced Garcia's prior statement to the prosecutor on January 18, 1991, at the time of the first trial, stating that Ramon had nothing to do with the shootings and that Ramon and his red car were not at the scene of the shootings.  <u>Id.</u> at 545.  On redirect, over a defense objection, <u>id.</u> at 423-24, Garcia explained that he had earlier changed his story to prosecutors only after having been placed in a holding cell with Ramon on several occasions.  <u>Id.</u> at 551. During one such encounter, Ramon told Garcia that he was on trial for a homicide that Garcia "knew about."  <u>Id.</u> at 552.  Garcia testified that, in order to avoid being identified as a prosecution witness, and out of fear for his safety and that of his family, he agreed to assist Ramon with his defense.  <u>Id.</u> at 552-53.  Garcia then recanted his prior statement to prosecutors, and provided the alibi story that Ramon had told him while they were in a holding cell together  <u>Id.</u>

Following this testimony, the court advised the jury to disregard the fact that Ramon had been in prison when considering his guilt or innocence, and that this testimony was offered

solely as evidence of Garcia's state of mind at the time of his earlier recantation.[9]

The second eyewitness offered by the prosecution was shooting victim Jose Cortes. Cortes testified that he saw two men arrive on the scene in a red Trans Am, and that he saw one of these men shoot Wilfredo Garcia. Tr. at 582. Cortes also testified that the two men "were young, not very tall, white skin and dark hair" and that they "looked like Dominicans." Id. at 582-83. According to Cortes, these individuals arrived on the block and parked their car while Wilfredo was inside a store. Id. at 582. The two men walked past Cortes and then sat on top of another car outside of this store.[10] Id. When Wilfredo exited the store he spoke to the men, although Garcia could not hear their conversation. Id. Then, as Wilfredo walked away, one of the two men ran toward Wilfredo and started to open fire. Id.

_____

[9] Although not discussed at the second trial, Garcia had given a different version of events during a June 27, 1988 interview with Detectives Chmil and Vitulli. At that time, Garcia told police that Ramon, and not Reynaldo, had been the shooter. Garcia specifically told police that Ramon had shot the boy Montanez in the bridge of the nose, after Montanez had turned to see who was shooting. See DD-5 Report # 23 and accompanying transcript, attached as Second Look Report Ex. DD-5-23.

[10] The R&R suggested that the two individuals who drove up in a red Trans Am sat on the hood of their own car while waiting for Wilfredo to exit the store. See R&R at 13. However, Cortes's actual testimony was that "[t]wo individuals arrived. They came out of a car. They passed in front of me. They sat on top of a car in front of the place where Wilfredo was." Tr. at 582.

Cortes only saw one person shooting, and did not see what the other man was doing after the shooting started. _Id._ at 583. Cortes moved to assist Wilfredo, after which he heard more shots and was himself shot in the top of his right leg. _Id._ Cortes and Wilfredo walked down Bedford Avenue from South 1st to South 2nd, until Cortes lost consciousness. _Id._ at 585. Cortes woke up in the hospital, where he remained for four days. _Id._ He testified that he did not recognize either the shooter or the driver. _Id._ at 584.

At trial, the prosecution played the post-arrest interview for the court and jury, over defense counsel's renewed objection. _Id._ at 410-14. The defense called no witnesses and introduced no exhibits.

After three days of deliberations, the jury found Ramon Espinal guilty of two counts of murder in the second degree, one count of attempted murder in the second degree, and one count of criminal possession of a weapon in the second degree. On April 29, 1991, Justice Barasch sentenced Ramon to two consecutive terms of 25 years to life on each second degree murder count, a consecutive sentence of 8 1/3 to 25 years' imprisonment for attempted murder in the second degree, and a concurrent term of imprisonment of 5 to 15 years for criminal possession of a weapon.

**Petitioner's Appeal and Collateral Attacks on His Conviction**

On direct appeal, petitioner challenged the admission of testimony regarding his uncharged drug offenses; the admission of his post-arrest statements; the prosecutor's alleged inflammatory comments on summation; an alleged modification of the indictment during jury deliberations; and the length of his sentence. Ramon's conviction was affirmed by the Appellate Division on October 11, 1994. <u>People v. Espinal</u>, 208 A.D.2d 644, 618 N.Y.S.2d 235 (2d Dep't 1994). The Court of Appeals denied his request for leave to appeal on February 21, 1995. <u>People v. Espinal</u>, 85 N.Y.2d 861, 624 N.Y.S.2d 380, 648 N.E.2d 800 (1995).

Since that final judgment, petitioner has waged a series of collateral attacks on his conviction in state and federal court.[11] Petitioner has filed three separate motions to vacate his conviction pursuant to New York Criminal Procedure Law § 440.10 ("Section 440") that are relevant here.

On October 30, 1996, petitioner, represented by counsel, filed his first Section 440 motion, on the grounds of newly discovered evidence related to two alibi witnesses who came forward after trial, Anthony Torres ("Torres") and Anthony Guzman ("Guzman"), and the ineffective assistance of trial counsel.

---

[11] The procedural history of those collateral attacks is detailed in full in the R&R at pages 15-23.

While preparing this motion in 1996, petitioner's counsel spoke by phone with Guzman, who was then in an undisclosed location within the federal Witness Protection Program.  <u>See</u> Guzman Aff., dated July 1, 2003, attached as Second Look Rep. Ex. D ("Guzman 2003 Aff."), at ¶ 20.  Petitioner's counsel, Fernando Camacho ("Camacho"), prepared an affidavit based on these calls.[12]  According to that unsigned affidavit, Guzman told Camacho that he and Torres were drag racing against petitioner "[i]n vicinity of South 4th Street and Roebling Street in Brooklyn, New York" on the evening of June 21, 1988 when they encountered Reynaldo fleeing from the shooting.  <u>See</u> Unsigned Aff. of Anthony Guzman, attached to Sept. 23, 1996 Letter from Fernando Camacho to Anthony Guzman, at ¶¶ 3-4.  Petitioner, however, was unable to submit a signed affidavit from Guzman with this Section 440 motion, because Guzman was moved by the witness protection program and disappeared prior to signing any papers.  Guzman 2003 Aff. ¶¶ 22-24.  Accordingly, in a decision dated August 7, 1997, Justice Barasch denied petitioner's claims with respect to potential alibi witness Anthony Guzman as unsubstantiated, "[i]nasmuch as the defendant, in lieu of providing an affidavit from Anthony Guzman or a reasonable explanation for failure to provide one, has supported his position solely with hearsay

---

[12] Fernando M. Camacho has been a Judge of the Criminal Court of the City of New York since 1997.

allegations contained in an attorney's affidavit." Aug. 7, 1997
Order, attached as RX E, at 8.

On January 14, 1998, the court held a hearing to evaluate
petitioner's claim of newly discovered evidence relating to
Anthony Torres. Following this hearing, Justice Barasch denied
the remainder of petitioner's motion, finding that Torres's
testimony was not newly discovered and that petitioner's
ineffective assistance claim was without merit. <u>See</u> Apr. 13,
1998 Decision and Order ("RX H") at 2-4.[13] Petitioner's
application to appeal was denied by the Second Department on
February 3, 1999, and an application for review was dismissed by
the Court of Appeals on February 24, 1999. <u>See People v.</u>
<u>Espinal</u>, 93 N.Y.2d 852, 688 N.Y.S.2d 499, 710 N.E.2d 1098 (1999).

On April 22, 1999, petitioner filed a second Section 440
motion <u>pro se</u>, alleging prosecutorial misconduct and that trial
counsel failed to inform him that the decision to testify rested
with him exclusively. Petitioner's second motion (and his
attempts to appeal to the Appellate Division and Court of
Appeals) also failed. <u>See People v. Espinal</u>, 95 N.Y.2d 889, 715
N.Y.S.2d 381, 738 N.E.2d 785 (2000). Subsequently, petitioner
filed his initial motion for habeas relief in federal court
pursuant to 28 U.S.C. § 2254 on March 8, 2000.

_____

[13] The 1998 ruling is discussed further below in Section (3)(a)
of the **Discussion** portion of this opinion.

An initial Report and Recommendation regarding petitioner's claims was issued by Magistrate Judge Steven M. Gold on October 30, 2002, to which both sides filed objections. Subsequently, petitioner requested by letter dated July 28, 2003 that his petition be held in abeyance so he could return to state court to exhaust additional claims of newly discovered evidence and ineffective assistance of counsel. That request was granted on January 21, 2004.

Petitioner filed his third Section 440 motion in state court on January 23, 2004, represented by current counsel Ruth M. Liebesman. In that motion, petitioner claimed that the proffered testimony of Anthony Guzman constituted newly discovered evidence that would have led to a more favorable verdict in his case.[14] Petitioner also claimed that his trial counsel was ineffective for failing to request that the court or prosecution reveal the name of a witness who appeared in a redacted police report and for failing to offer an alibi defense on petitioner's behalf.

In a decision dated May 20, 2004, the state court (Silverman, J.) rejected all of petitioner's claims.[15] First,

---

[14] Guzman was released from prison in 1999. Guzman claims that he subsequently learned that petitioner remained in prison, contacted the Espinal family to offer assistance and gave a sworn statement of events to petitioner's counsel. See Guzman 2003 Aff. ¶¶ 25-28.

[15] The 2004 ruling is discussed further below in Section (3)(a) of the **Discussion** portion of this opinion.

the court found that Guzman's testimony was not "newly
discovered," because it was known to petitioner before trial and
had not been submitted in a sufficiently timely fashion.  The
court also found that Guzman's testimony "would be cumulative to
the alibi evidence already before the jury" through petitioner's
videotaped post-arrest statement to Assistant District Attorney
Lewis.  Second, the court found that petitioner was not entitled
to an unredacted copy of the June 22, 1989 police report, because
an <u>in</u> <u>camera</u> review of the report showed that it was not from an
interview with Guzman, and because "the redacted police report
does not support defendant's alibi."  Finally, the court agreed
with the two previous state court rulings that petitioner's
claims of ineffective assistance of counsel were without merit.
The court added that petitioner's claims regarding trial
counsel's failure to seek an unredacted police report or to
present an alibi defense were raised in petitioner's first
Section 440 motion, so that they were procedurally barred in the
current motion.

Subsequently, petitioner moved to reopen his federal
petition for habeas relief.  The petition was reopened on
November 8, 2004.  Following Magistrate Judge Gold's recusal on
February 15, 2005, the matter was referred to Magistrate Judge
Mann for a report and recommendation.  Following additional

submissions by the parties, Judge Mann issued her Report and
Recommendation on May 23, 2006. In that Report, Judge Mann
recommended that Ramon Espinal's petition for a writ of habeas
corpus pursuant to 28 U.S.C. § 2254 be denied, and that his case
be dismissed.

On June 9, 2006, the Second Look Program of Brooklyn Law
School moved to appear as amicus curiae in this case. This
motion was granted on June 28, 2006. The Second Look Program
submitted with its motion a copy of its November 15, 2005
Memorandum to the Brooklyn District Attorney's office (the
"Second Look Report"), in which the Second Look Program argued
that petitioner was wrongly convicted.

This case was held in abeyance pending a response from the
Brooklyn District Attorney's office. On May 7, 2007, counsel to
the District Attorney submitted a letter to the court stating
that he had reviewed the full record to this case, including the
Second Look Program's memorandum, and had interviewed two of the
witnesses in the case. The District Attorney's counsel concluded
that "[a]fter reviewing those documents and interviewing the
witnesses, it is my opinion that the District Attorney's Office
has not received any new evidence to alter our belief that the
defendant, acting in concert with his brother Reynaldo Espinal,

committed the crimes charged."  Letter from Lance P. Ogiste,

dated May 7, 2007 ("Ogiste 2007 Letter") at 2.


**Discussion**

**(1)**

**Legal Standards**

Petitioner claims that he received ineffective assistance of

counsel in violation of his rights under the Sixth Amendment.

<u>Strickland v. Washington</u>, 466 U.S. 668, 685 (1984).[16]  In order

to prevail on this claim, petitioner must establish both that the

performance of his trial counsel was constitutionally deficient,

and that this deficient performance prejudiced his defense.

<u>Strickland</u>, 466 U.S. at 687.  To establish prejudice, petitioner

"must show that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding

would have been different.  A reasonable probability is a

probability sufficient to undermine confidence in the outcome."

---

[16] The parties have disagreed about whether petitioner's
ineffective assistance of counsel claims are procedurally barred
from federal habeas review.  Judge Mann concluded, however, that
the only one of petitioner's claims that was procedurally
defaulted was his claim that trial counsel failed to inform him
of his right to testify.  <u>See</u> R&R at 47-48.  Petitioner has
failed to object to Judge Mann's conclusion that this "right to
testify" claim, in addition to being beyond the review of this
court, also lacks any merit.  <u>See</u> R&R at 53-57.  Accordingly that
claim need not be reconsidered here.  Judge Mann's finding that
all of the remaining ineffective assistance of counsel claims are
subject to federal habeas review is hereby adopted.

Strickland, 466 U.S. at 694.  Once such a showing is made, the claim is not defeated by a showing that counsel provided competent representation in a more general sense.  See Henry v. Poole, 409 F.3d 48, 72 (2d Cir. 2005) (holding that a state court unreasonably applied Strickland when it ignored the probable impact of counsel's unprofessional errors, and instead relied on a finding that counsel provided meaningful representation overall).  A court reviewing an ineffective assistance of counsel claim "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  Strickland, 466 U.S. at 690; Murden v. Artuz, 497 F.3d 178, 198 (2d Cir. 2007); Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

Petitioner raised these ineffective assistance of counsel claims in state court through his Section 440 motions.  Under the deferential standard required by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal court may not issue a writ of habeas corpus on a claim that was adjudicated on the merits in state court proceedings "unless the state court adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding.'" <u>Murden</u>

<u>v. Artuz</u>, 497 F.3d 178, 197 (2d Cir. 2007) (quoting 28 U.S.C. §

2254(d)(1)-(2)).

**(2)**

**Petitioner's Ineffective Assistance of Counsel Claims**

Under <u>Strickland</u>, courts are instructed to evaluate whether

attorney conduct was reasonable "from counsel's perspective at

the time," and petitioner must overcome "the presumption that,

under the circumstances, the challenged action might be

considered sound trial strategy." <u>Strickland</u>,466 U.S. at 689

(internal quotations and citations omitted).  However, a sound

trial strategy must be based on reasonable investigations.  In

preparing for trial, "'[c]ounsel has a duty to make reasonable

investigations or to make a reasonable decision that makes

particular investigations unnecessary.'" <u>Lindstadt v. Keane</u>, 239

F.3d 191, 200 (2d Cir. 2001) (quoting <u>Strickland</u>, 466 U.S. at

691).  <u>See also</u> <u>Gersten v. Senkowski</u>, 426 F.3d 588, 607 (2d Cir.

2005).  A reasonable decision to forego investigation may be

based on a reasoned judgment that such investigation would be

fruitless, wasteful, or even counterproductive.  <u>Schulz v.</u>

<u>Marshall</u>, 528 F. Supp. 2d 77, 95-96 (E.D.N.Y. 2007).  But a

failure to conduct reasonable investigation into possible alibi

evidence, in the absence of such a reasonable explanation, falls

23

below the standard of effective representation required by

Strickland.  See Lindstadt, 239 F.3d at 200; Schulz, 528 F. Supp.

2d at 96; Sparman v. Edwards, 26 F. Supp. 2d 450, 452-53

(E.D.N.Y. 1997).

**a.**   **Trial Counsel's Failure to Investigate the Redacted DD-5
         Report of David Garcia Rendered His Assistance
         Constitutionally Deficient Under the First Prong of
         Strickland**

Petitioner claims that his trial counsel provided

ineffective counsel by failing to investigate and discover the

witness who appeared in a redacted DD-5 report dated June 22,

1989.  This report recounts a police interview with a witness

named David Garcia, whose name was blacked out in the copy of the

DD-5 that was provided to petitioner before trial.  Garcia

related the following story about the shootings:[17]

> I was hanging out on South 4 St. & Havemeyer with two
> other guys, both named [Anthony].  One of the guys had
> his car (Beige color) with him.  It was in the evening
> and dark.  A Red Fire-Bird pulled up to the corner, I
> did not see who was driving.  Just as the car stopped
> another guy I know from the area came running up the
> street.  His hand was bleeding and he had a gun in the
> other one.  He yelled to us that he had just shot some
> one and jumped into the red Fire-Bird.  The car then
> drove off.  We got into [Anthonys'] car and started to
> follow the Firebird.  Somewhere near the 90 Pct. the
> Firebird pulled over.  The guy who was shot got out of
> the passenger side and threw a gun into an empty lot.
> They then drove off.  I then got out of the car climbed
> over a fence and recovered the gun.  It was a 9MM, and

---

[17] Text in brackets was crossed out in the redacted version of
this report that was originally provided to petitioner, which is
attached as an appendix to this opinion.

> still loaded.  We took the gun to [Anthonys'] house.
> The next day we heard the gun was used in a murder.
> That night, myself, the two [Anthony's] and my cousin,
> [Mark Garcia] took the gun to the East River and threw
> it in.  I'm not sure exactly where the gun was thrown
> in.

Garcia was shown six color photos and identified Reynaldo Espinal as the man who was running with the gun in his hand.

Petitioner has claimed since his first Section 440 motion that trial counsel was ineffective for failing to investigate this redacted DD-5 report.  Affidavit of Daniel M. Felber, dated Oct. 28, 1996, attached as RX C ("Felber Aff."), at ¶ 17. Petitioner argues that this DD-5 report corroborates his alibi, because it supports his claim that he was driving his red Firebird in the vicinity of South 4th Street and Havemayer when he encountered Reynaldo, and that he was not with Reynaldo at the corner of South 1st Street and Bedford Avenue at the time of the shootings.

Krinsky apparently had the relevant police reports at the time of trial.[18]  Krinsky testified at the Section 440 hearing held on January 14, 1998 that had no personal recollection of this document, but that he likely would have received this report

---

[18] Counsel for petitioner's first Section 440 motion was given these police reports by petitioner and his appellate counsel. Felber Aff. at ¶ 17.  In addition, the prosecution stated at a November 9, 1990 pre-trial hearing that Krinsky had been provided with the DD-5 police reports "quite some time" before that hearing.  Tr. at 6.

on the eve of trial.  H. Tr. at 187-88.  He also testified that
he had most likely received these reports after he had spoken
with Anthony Torres, the only potential alibi witness available
to him.  H. Tr. at 187-88.[19]  Krinsky did not recognize the
redacted report, or the other DD-5 reports, as important evidence
for petitioner's alibi claims, apparently because he had already
decided to forego an alibi defense by the time he received them.

Krinsky's decision to forego an alibi defense might have
seemed a reasonable trial strategy in light of his failed efforts
to investigate his client's claims.  As Krinsky explained at the
1998 hearing, he contacted Anthony Torres on petitioner's behalf
prior to trial and found him to be immediately hostile.  H. Tr.
at 160-64.  Krinsky testified that Torres refused to answer any
questions about the night of the shootings.[20]  Torres told

---

[19]    Q: At that point [of Krinsky's first conversation with
Anthony Torres] you already knew, you already had the discovery
in the case.  Is that correct?
    [Krinsky]: When I spoke to Torres?  Probably not.  Because
in those days, compared to now, in those days they wouldn't turn
over police reports until really the eve of trial.

[20]  Torres claims that he contacted Krinsky on his own, and that
he informed Krinsky "that Ramon Espinal had been with me at
another location at the time of the shooting."  Torres 2005 Aff.
at ¶ 13.  See also H. Tr. at 41.  Krinsky testified to the
contrary that he initiated the conversation with Torres, and that
Torres refused to tell him anything because of his fear of
Wilfredo Garcia's family.  Id. at 159-63 & 193.  Krinsky
testified he asked Torres questions that might confirm Ramon
Espinal's drag racing story, but that Torres refused to respond
to these questions.  Id. at 163, 193.  Judge Mann appropriately
found Krinsky's version of this conversation to be more credible

Krinsky that he would not cooperate because he was afraid Wilfredo Garcia's family might retaliate against him if he attempted to assist the Espinals.  In addition, Torres had an extensive criminal record.  Under these circumstances, Krinsky reasonably concluded that Torres would only be a liability to petitioner's case.

In addition, Krinsky attempted, but failed, to identify and locate Anthony Guzman.  Krinsky explained at the section 440 hearing that petitioner's family had identified two potential alibi witnesses, Anthony Torres and "someone who they only had a street name for."  H. Tr. at 184.  This second individual was presumably Anthony Guzman.  But Guzman, who at that time was in an undisclosed location in the federal Witness Protection Program, Guzman 2003 Aff. ¶ 20, could not be found.  Accordingly, Krinsky investigated all of his client's suggested leads and was unable to find any witnesses who could corroborate his alibi.

Nonetheless, an existing trial strategy, even if initially reasonable, cannot excuse counsel's failure to investigate new evidence that could potentially exonerate his client or create reasonable doubt in the minds of the jury.[21]  In the absence of

_____

than Torres's version.  R&R at 30.
[21] Petitioner also claims that these police reports support his alibi defense by showing that police were looking for a single gunman after the shootings.  Petitioner is correct that police reports show that police were canvassing local hospitals during the hours immediately following the shootings looking for "a male

any alibi witnesses, Krinsky's trial strategy was to poke holes in the prosecution's case, in order to create doubt in the jury's mind about his client's guilt.  <u>See</u> H. Tr. at 167-68.  This strategy was largely successful at Ramon's first trial, where ten jurors were reportedly prepared to acquit based on their doubts about the credibility of the prosecution's case.  <u>See</u> <u>id.</u> at 169-70.  However, it appears that Krinsky's existing – and almost successful – trial strategy blinded him to the importance of the police reports he received prior to trial.  As a result, Krinsky failed to consider whether these reports, particularly the redacted report showing that an unknown witness had told police a story very similar to his client's story, could have salvaged Ramon's alibi defense.[22]  It may be difficult to find personal fault in this error, in light of Krinsky's vigorous representation of petitioner at trial.  Nonetheless, this error

_____

hispanic, light skinned, 5' 9", approximately 20 years of age seeking treatment for a gunshot wound."  <u>See</u> RX C.  These reports suggest that police had some information indicating that Reynaldo Espinal had been shot during this incident, as claimed by Ramon in his alibi defense.  However, the fact that police were trying to find one injured shooter in the hospital does not necessarily prove that police believed that there was <u>only</u> one shooter involved in this incident.  It would be equally reasonable to presume that police believed there were two shooters, but only one had been injured.

[22] Krinsky also may have wrongly assumed that the redacted DD-5 was from an interview with the missing alibi witness Anthony Guzman.  As explained below, this is an error that has been made by petitioner's counsel throughout his collateral proceedings.

rendered Krinsky's vigorous defense of his client ineffective.

Courts have found that a trial counsel's failure to investigate potentially exculpatory evidence, in the absence of a reasonable explanation, falls below the constitutional standard of effective representation required by Strickland. See Lindstadt, 239 F.3d at 200 (finding counsel ineffective where failure to investigate the available evidence "prevented [petitioner] from offering something akin to an alibi"); Schulz, 528 F. Supp. 2d at 96 (finding counsel ineffective for "breach[ing] his duty to investigate [petitioner's] case diligently"); Sparman v. Edwards, 26 F. Supp. 2d 450, 452-53 (E.D.N.Y. 1997) (finding counsel ineffective for failing to investigate evidence). Petitioner has shown that trial counsel failed to investigate whether the redacted police report and other disclosed materials could have supported his alibi claims. Krinsky did not recall any of these documents when asked about them in the Section 440 hearing, and he failed to offer any explanation to excuse his decision not to investigate this possible alibi evidence. In light of the facts of this case, and in the absence of a reasonable explanation, counsel's failure to investigate these police reports cannot be presumed to be sound trial strategy. Accordingly, petitioner has satisfied the first prong of the Strickland test.

**b.** **Trial Counsel's Failure to Investigate the Alibi Evidence in the Redacted Police Report Prejudiced Petitioner Sufficiently to Meet the Second Prong of <u>Strickland</u>**

Under <u>Strickland</u>, counsel's errors alone are insufficient to warrant relief.  Petitioner must also prove that "counsel's errors prejudiced the defendant to the extent that they 'undermine confidence in the outcome'" of his trial.  <u>Lindstadt</u>, 239 F.3d at 204 (quoting <u>Strickland</u>, 466 U.S. at 694).  <u>See also</u> <u>Henry v. Poole</u>, 409 F.3d 48, 63 (2d Cir. 2005) ("[T]he defendant must show more than that the unprofessional performance merely 'had some conceivable effect.'  To satisfy the 'reasonable probability' test, however, 'a defendant <u>need not show</u> that counsel's deficient conduct <u>more likely than not</u> altered the outcome in the case.'" (quoting <u>Strickland</u>, 466 U.S. at 693 (emphasis in Second Circuit's opinion))).  As noted, trial counsel failed to investigate or present available evidence that could have supported petitioner's alibi claims at trial.  There is a reasonable probability that a credible alibi defense, supported by this available evidence, could have placed reasonable doubt in the minds of the jury.  Accordingly, petitioner has established that counsel's errors unacceptably prejudiced the outcome of his trial.

As explained above, petitioner was convicted largely on the strength of two eyewitnesses.  One of these eyewitnesses, Anthony

Garcia, identified Ramon at the scene of the shootings.  Assuming that the prosecution witnesses told the truth, this evidence is more than sufficient to support a guilty verdict.

In evaluating the strength of the prosecution's case, however, it must be noted that Anthony Garcia's story changed multiple times before he testified at Ramon's retrial.[23] Garcia's first statement to police named Ramon as the shooter, and claimed that Ramon viciously shot Alberto Montanez in the face at point-blank range.  <u>See</u> Second Look Rep. Ex. DD-5-23. Shortly before the first trial was to begin, Garcia recanted his story and told prosecutors that Ramon was not involved in the shootings.  Then, before the start of the January 1991 trial, Garcia reaffirmed to prosecutors that he would testify against Ramon.  At both the first trial and the retrial, Garcia explained that he had recanted his initial story because he had been placed in a holding cell with Ramon prior to the first trial, and Ramon had asked him to assist in his defense.  Garcia agreed to assist Ramon because he feared for the safety of himself and his family. <u>See</u> Tr. at 552-53; R&R at 12-13; Jan. 29, 1991 Tr. at 744-47. Garcia specifically indicated that Ramon asked him to vouch for the story that Ramon was at South 4th and Havemeyer during the

---

[23] Anthony Garcia's testimony at Ramon's first trial and retrial remained consistent.  <u>Compare</u> Jan. 29, 1991 Tr. at 671-748, <u>with</u> Tr. at 444-570.

shootings.  Tr. at 553.  However, Garcia's testimony at Ramon's

first and second trials differed significantly from his original

statement to police.  The record provides no explanation for why

Garcia, after initially identifying Ramon as the primary shooter,

testified at both trials that he did not see Ramon shoot

anyone.[24]

   The inconsistencies in Anthony Garcia's stories raise

questions about the credibility of his testimony at Ramon's

second trial.  But Garcia's trial testimony also provides

evidence that Ramon asked other individuals to support his alibi

claims.  Such testimony necessarily raises the specter of

collusion, and calls into question the credibility of

petitioner's post-trial alibi witnesses, Anthony Torres and

Anthony Guzman, particularly in light of the fact that Torres and

Guzman did not provide any statements to investigators or the

court until after Ramon discussed this matter with Torres in

prison in 1995.  See Affidavit of Anthony Torres, dated Oct. 4,

---

[24]  Petitioner has claimed that his trial counsel erred by
failing to cross-examine Garcia about the inconsistencies between
his initial statement to police and his trial testimony.
However, Krinsky explained at the Section 440 hearing that he
declined to cross-examine Anthony Garcia about these
inconsistencies because Garcia's earlier statement was far more
damning to his client.  H. Tr. at 201 ("His trial testimony
wasn't as bad as this.  You want me to impeach [] a guy with a
worse statement, in front of a jury?").  As the R&R concluded,
this strategic decision is within the range of professional
behavior permitted by Strickland.  R&R at 72-73.

2005, attached as Second Look Rep. Ex. C ("Torres 2005 Aff."), at

¶ 17.[25]

---

[25]     Guzman has claimed that he told state and federal
investigators of Ramon's innocence in 1988 and 1989.  See Guzman
2003 Aff. ¶¶ 16-19; Guzman 2005 Statement ¶ 3.  Extensive
searching has found no evidence to corroborate this claim.  But
evidence has been found to suggest that Guzman told federal
prosecutors in 1989 that the shooting of Wilfredo Garcia was a
premeditated "set up."  The only possible exonerating aspect of
the notes was the fact that it referred to "Dominican" in the
singular.

    Guzman became a cooperating witness with federal prosecutors
after his arrest in 1989.  After petitioner submitted his
objections to the R&R, the United States Attorney's Office of the
Eastern District of New York ("USAO") was asked to review its
files from the case in which Guzman was a cooperating witness, to
determine whether there were any notes or papers that could
corroborate this story.  After an extremely thorough search of
its files, the USAO identified a page of notes taken by then-
Assistant U.S. Attorney Peter Ginsberg ("Ginsberg") during a
proffer session held with Guzman on October 6, 1989, about three
and a half months after Ramon's arrest.  Ginsberg reviewed these
notes with the parties and the court at a March 17, 2008 status
conference, to attempt to determine whether Guzman told federal
prosecutors of Ramon's innocence in 1989 as he claims.

    Ginsberg's notes fail to indicate whether Guzman gave any
information exonerating Ramon Espinal.  These notes read in their
entirety:

        6/88 – Bedford – 2 guys killed – [Wilfredo] & innocent
        kid killed – [Guzman] got rid of gun – killed by
        Dominican – set up by Vivian – fight over crack.

As one would expect, Ginsberg had little personal recollection of
the October 6, 1989 proffer session.  Guzman never testified at
trial for federal prosecutors, and the murder at the center of
this case was not relevant to that prosecution, so federal
prosecutors did not follow up on the substance of Guzman's
proffer session.  However, Ginsberg stated at the March 17, 2008
hearing that his memory was somewhat refreshed by his notes, and
that he did recall Guzman telling federal prosecutors about this
murder.  Ginsberg was unable to remember whether Guzman
specifically mentioned anything about Ramon Espinal's innocence
in this shooting.  Mar. 17, 2008 Tr. at 6-8.  Ginsberg also

33

These concerns over the credibility of Torres and Guzman's proffered testimony provide the backdrop for considering trial counsel's failure to investigate the redacted DD-5 report of David Garcia. In retrospect, this DD-5 report appears to be the only significant piece of evidence in the record that corroborates petitioner's alibi claims, but more significantly, that remains untainted by the possibility of collusion between petitioner and his alibi witnesses to manufacture an alibi defense.

Based on this DD-5 report, it appears that David Garcia, during an interview on June 22, 1989, told police a version of events that corroborates significant details of the story that

_____

claimed that he "would remember" if Guzman had told him that an individual accused of a murder was not the person who had committed the crime, and "if that had happened we would take measures that the proper people in . . . the DA's office knew about that." Id. at 7.

Ginsberg's notes from 1989, however, do suggest that Guzman told prosecutors that Wilfredo was "set up" on the night of the shootings, and that the murder had something to do with a "fight over crack." In other words, although there is no way to know whether Guzman mentioned Ramon Espinal by name or discussed Ramon's innocence during this proffer session, he does appear to have discussed the motive and planning for the murder of Wilfredo Garcia with federal prosecutors. It is significant that Guzman's affidavits (and indeed all of the stories about the shootings told by Ramon and his alibi witnesses in the course of these proceedings) fail to include any such information about the motive or planning behind these shootings. At the very least, the USAO's notes suggest that Guzman knows more about the background to these shootings, either based on his personal knowledge or through the hearsay of confederates, than his affidavits reveal.

Ramon gave police after his arrest on June 19, 1989. Both David and Ramon told police that Reynaldo was picked up by a red car sometime <u>after</u> the shooting, a few blocks away from the scene of the shooting itself. Both David and Ramon specifically told police that the encounter with Reynaldo took place at South 4th Street and Havemayer. Accordingly, this report provided defense counsel with corroborating evidence that should have spurred him to pursue and attempt to mount a credible alibi defense.

This DD-5 report also states that David Garcia had previously been interviewed by police "last year shortly after this incident." There is no evidence in the record of what David Garcia told police during the initial investigation, and respondent has been unable to uncover any notes or police reports relating to this earlier police interview of David Garcia. <u>See</u> Letter from Lance Ogiste, dated Aug. 11, 2008. However, there is also no indication in this DD-5 report that David Garcia's story had changed since the earlier interview.

Unlike the later statements offered by Torres and Guzman, which are necessarily tainted by the passage of time and the possibility of collusion, the David Garcia DD-5 report bears significant indicia of credibility. Notably, David Garcia did not mention either Ramon or Reynaldo by name (although he subsequently identified Reynaldo out of a photo array). This

suggests that he was not telling this story <u>in order to</u> exonerate Ramon. If David Garcia's goal was to help free Ramon Espinal, then he would logically have given Ramon's name to police officers. But there is nothing in the police recounting of the David Garcia interview to suggest that he was trying to provide them with an alibi for Ramon.

Similarly, when Ramon told his lawyer to track down alibi witnesses for trial, he never mentioned David Garcia by name. Instead, he told his lawyer to find Anthony Torres and another individual known only by his street name (now known to be Anthony Guzman). <u>See</u> H. Tr. at 184. The fact that Ramon never identified David Garcia as a possible witness suggests that Ramon and David did not concoct this story together, and in fact that Ramon may not have even known that David Garcia was a witness to any of these events.

In sum, there is no evidence in the record to show that David Garcia knew the Espinal brothers, although he may have recognized them from the neighborhood. Even assuming that Garcia knew Ramon Espinal, however, there is no evidence to show that he colluded with Ramon on an alibi story. The record shows that David Garcia provided police with a story that largely corroborated Ramon's alibi claims shortly after Ramon's arrest, but Garcia's failure to identify Ramon by name is a strong

36

indication that Garcia did not manufacture this story in concert with Ramon.

In addition, although there is no record of what David Garcia told Detectives Chmil and Vitulli during the initial investigation of these shootings, nothing in Detective Chmil's DD-5 report suggests that Garcia's later interview contradicted that prior conversation. There is no reason to believe that Garcia's story ever changed, and in fact it is reasonable to expect that Detective Chmil would have noted in his DD-5 report if Garcia's story had changed. This suggests that David Garcia told this same story to police shortly after the shootings. If so, it is even more unlikely that Garcia could have collaborated with Ramon on a false alibi at that time, because Ramon took off for the Dominican Republic within hours of the shootings.

David Garcia's DD-5 also largely tracks the later affidavits given by Torres and Guzman. The passage of time necessarily raises doubts about the reliability of the Torres and Guzman affidavits, particularly because Torres and Guzman did not come forward until after Torres spoke with Ramon in prison. Indeed, respondent has argued that the Guzman affidavit in particular was manufactured to track the details of this police report. For example, respondent points out that Guzman apparently told petitioner's counsel in 1996 that Reynaldo had given him the gun

to dispose of, whereas Guzman's 2003 affidavit instead tracks David Garcia's story about retrieving the gun after Reynaldo threw it into an empty lot.  Compare Aff. of Fernando Camacho, dated Oct. 28, 1996, attached as RX C, at ¶ 6, with Aff. of Anthony Guzman, dated July 1, 2003, attached as Second Look Rep. Ex. D ("Guzman 2003 Aff."), at ¶¶ 11-12.  Given the lengthy passage of time since the events in question, it is difficult to know whether these inconsistencies are the consequence of faulty memory, influenced by other individuals' recollections of the same events, or whether the details are changing because Guzman is trying to help his friend by colluding on an alibi story.  But while it is possible that the Torres and Guzman affidavits were influenced over the years by David Garcia's DD-5 report, there is no evidence that David Garcia ever discussed his story with Torres and Guzman before speaking to police in 1989.

In short, although David Garcia's statement may differ in some details from petitioner's other alibi evidence, it corroborates the critical claim made by Ramon immediately after his arrest: that Ramon picked up his brother a few blocks from the shooting incident, shortly after the shooting occurred.  This can only lead the court to two possible conclusions: that David Garcia was somehow part of an effort with these other individuals to manufacture an alibi story, or that David Garcia was telling

the truth.  But there is no evidence anywhere in the record to suggest that David Garcia was colluding with these other witnesses.  Thus, the absence of David Garcia's name elsewhere in the record actually bolsters the credibility of his statement to police, because presumably these other witnesses would have thought to identify David Garcia as an alibi witness if they had been colluding with him on a story to exonerate Ramon.

Of course, the absence of David Garcia from any of these other alibi stories also raises an obvious question about his credibility: how can David Garcia have been privy to these events when neither Anthony Torres nor Anthony Guzman places him at the scene?  Both Torres and Guzman have signed statements that they were out driving with David's cousin, Marcus "Bon-Bon" Garcia, on the night of the shootings.  <u>See</u> Aff. of Anthony Torres, dated Oct. 4, 2005, attached as Second Look Rep. Ex. C ("Torres 2005 Aff."), at ¶ 2; Signed Statement of Anthony Guzman, dated Oct. 1, 2005, attached as Second Look Rep. Ex. D ("Guzman 2005 Statement"), at ¶ 1.  A closer look at the changing stories of these individuals, however, suggests that it is possible that Torres and Guzman, beginning sometime around 2003, mistakenly identified Marcus Garcia as the third individual with them on the night of June 21, 1988, when it fact it may have been Marcus's cousin David Garcia.

Indeed, the only way to reconcile certain discrepancies between the various alibi stories in the record is to assume that David Garcia, and not Marcus Garcia, was the individual riding in a beige car with Anthony Guzman and Anthony Torres on the night of the shootings.  As already noted, David Garcia told police that he was hanging out that night "with two other guys, both named Anthony."  David also told police that he helped to throw away the gun used in these shootings the next day with "the two Anthony's and my cousin, Mark Garcia."  Notably, Marcus Garcia has told the District Attorney's office that he was not with Torres or Guzman the night of the shootings, but that at some time after that night Marcus was involved with Torres and another individual in the disposal of a gun.  Ogiste 2007 Letter at 6. David Garcia's statement to police in 1989 and Marcus Garcia's statements to the DA in 2006 and 2007 could both be true, however, if it was David Garcia, and not Marcus Garcia, who was with Guzman and Torres on the night of the shootings.[26]

---

[26]    Police reports show that on June 24, 1988, Detective Robert Alongi requested that a Scuba Team search in the East River for the gun used in these homicides.  DD-5 47, attached as Ex. G to RX C.  This DD-5 report (# 47) states that a 9 mm pistol was recovered by police divers at North 3rd Street and the East River on August 20, 1988.
    Detective Alongi was the police officer who arrested Anthony Guzman (on an unrelated charge) in 1989.  As already noted, Alongi was a 90th Precinct Detective who, at the time, was assigned to the Eastern District of New York's DEA Task Force. Mar. 17, 2008 Tr. at 3; Guzman 2005 Statement ¶ 3.  Guzman claims that Alongi had been "harassing" Anthony Torres the day after

Although Guzman and Torres have asserted in their most recent statements that Marcus Garcia was with them on the night of the shootings, they previously were uncertain about the identity of the third passenger in their car that night. In 1998, Torres testified that he could not remember the name of the third person in the car that night with Anthony Guzman and himself. H. Tr. at 21. In his most recent affidavit, dated October 4, 2005, Torres now claims that he remembers that the third person in the car with him on the night in question was Marcus Garcia. Torres 2005 Aff. at ¶ 2. Torres states that he has not asked Marcus Garcia about these events, but that he confirmed with Guzman that the third person in the car was Marcus Garcia. Id. at addendum.

Similarly, Guzman stated in his July 1, 2003 affidavit that "[a]nother person, whose name I do not recall, also was in the

---

these shootings about the murder weapon, prompting these individuals to discard the gun into the East River. Guzman 2003 Aff. ¶¶ 13-15. Guzman claims he subsequently went to the 90th Precinct to tell investigating detectives what he knew. Id. ¶ 15.

The DD-5 Report (# 47) suggests that somebody told Detective Alongi within three days of the shootings that the murder weapon had been thrown into the East River. Detective Alongi currently recalls being given this information by Marcus Garcia. See Letter from Lance Ogiste, dated August 19, 2008. If Marcus Garcia did, in fact, give this information to Alongi, that would tend to suggest that Marcus's recent statement to the DA about throwing a gun into the East River with Torres and another individual could have involved the weapon used in these shootings. See Ogiste 2007 Letter at 6.

car" that night with himself and his cousin Anthony Torres.
Guzman 2003 Aff. ¶ 2.  It is only in his later October 1, 2005
statement to the Second Look Program that Guzman identifies this
third person as Marcus Garcia.  Marcus Garcia has denied (to both
the Second Look Program and the District Attorney) that he was in
the car that night.  <u>See</u> Second Look Rep. at 12 n.16; Ogiste 2007
Letter at 5.  But David Garcia told police in 1989 that he was
out with the two Anthony's that night, and that Marcus was only
involved in the subsequent disposal of the gun the next day.[27]

    Accordingly, it is reasonable to assume that Torres and
Guzman have wrongly convinced themselves that Marcus Garcia was
the third passenger, perhaps because they correctly remember that
Marcus Garcia was involved the next day with the disposal of
Reynaldo Espinal's gun.  In light of David Garcia's apparently
credible statement to police, it appears equally logical to
assume that it was in fact David Garcia who was the third
passenger that evening.  If this assumption is correct, then
David Garcia's DD-5 provides significant corroboration that the

_____

[27] Adding to the confusion is the fact that Guzman's 2003
Affidavit claimed that he had instructed Anthony Torres and
<u>Anthony Jose Garcia</u> to discard the firearm used in these
shootings.  Guzman 2003 Aff. ¶ 14.  In his 2005 statement, Guzman
claimed that he instructed Torres and <u>Marcus Garcia</u> to get rid of
the gun.  Guzman 2005 Statement ¶¶ 1-2.  It should be noted that
Marcus Garcia, in addition to being the cousin of police
interviewee David Garcia, is the brother of Anthony Garcia, who
was the chief prosecution witness in this case.  <u>See</u> Letter from
Lance Ogiste, dated Aug. 19, 2008, at 2.

basic story told by Ramon, Torres and Guzman – that Ramon was not at the site of the shootings, and that he only encountered his brother while driving a half-mile away – may be accurate.

It is difficult to gauge with certainty the veracity of David Garcia's story, now that he is no longer alive to discuss the events of that evening or his interview with police. The record reveals almost nothing about Garcia. The New York State Department of Correctional Services website shows that Garcia was a convicted criminal, and that he served time for first degree robbery between 1992 and 1997. Otherwise, all that is known about Garcia is that he was shot to death on July 19, 2001.[28]

But it is very troubling that trial counsel's failure to investigate this redacted report prevented petitioner from discovering this possible alibi witness while David Garcia was

---

[28] By Order dated July 29, 2008, the Kings County District Attorney's office was asked to submit for the record a letter detailing the date and circumstances of David Garcia's death. According to the response:

> On July 19, 2001, David Garcia was shot twice in the back of his head by his friend Mike Lampon. David Garcia had gone to the apartment of Mike [Lampon]. They had been drinking. They decided to buy cocaine. Lampon gave $20.00 to Garcia to purchase the drugs. When Garcia returned he did not have the drugs or the money. David Garcia went into a bedroom in the apartment to sleep. While Garcia was sleeping, Lampon loaded his 22 caliber rifle, entered the room and shot Garcia twice in the head. Lampon then turned the gun on himself and shot himself in the chest.

Letter from Lance P. Ogiste, dated Aug. 11, 2008.

alive.[29]  It is very possible that Garcia could have provided

important corroborating evidence if he had been contacted by

defense counsel prior to trial.  Although these issues cannot be

resolved conclusively based on the existing record, the

probability that this evidence would have changed the outcome of

petitioner's trial is sufficient to undermine confidence in the

trial verdict.  See Henry v. Poole, 409 F.3d 48, 64 (2d Cir.

2005) ("'The result of a proceeding can be rendered unreliable,

and hence the proceeding itself unfair, even if the errors of

counsel cannot be shown by a preponderance of the evidence to

have determined the outcome.'" (quoting Strickland 466 U.S. at

694 (emphasis added by Second Circuit))).  Defense counsel's

failure to investigate the redacted DD-5 report, and to discover

that it was David Garcia who told police a story that

corroborated Ramon's alibi claims, prejudiced petitioner by

eliminating his best opportunity to cast significant doubt on the

prosecution's case at trial.  This error casts sufficient doubt

on Ramon's conviction at trial to satisfy the prejudice prong of

Strickland.

_____

[29]  Indeed, given the centrality of this redacted report to
petitioner's claims since his first Section 440 motion, see H.
Tr. at 4-5, and the considerable confusion over the identity of
this witness, it is troubling that this piece of evidence was not
disclosed sooner.  It would have been far preferable for this
unredacted report to have been considered fully when petitioner
first raised this claim in 1996, while David Garcia was still
alive to answer these questions.

The R&R concluded instead that "rather than presenting proof of an alibi, the redacted report contains highly incriminating evidence of an apparently coordinated getaway involving a person driving a red car (concededly petitioner) and the undisputed shooter (Reynaldo)." R&R at 42. Judge Mann rightly noted that the David Garcia DD-5 report fails to mention a meeting at a nearby gas station or a drag race, and that the absence of these details raises questions about their credibility. Nonetheless, petitioner correctly objects that there has never been any evidence in this case to suggest that Ramon and Reynaldo planned to meet at South 4th Street and Havemeyer, at a distance of about a half-mile away from the shootings at South 1st Street and Bedford Avenue. All of the evidence put forward by the prosecution at trial placed Ramon and his red car at the scene of the shootings. Ramon has claimed, and all of his alibi evidence is intended to prove, that he encountered Reynaldo by chance a few blocks from the shooting while he was out driving. Therefore, while it is not unreasonable to speculate that Ramon and Reynaldo planned to meet after the shootings, this is not a claim that has ever been made by the prosecution or that has ever been supported by any substantial evidence.

In addition, the R&R credited trial counsel's claim that "the drag-racing story did not necessarily exonerate petitioner,

45

as it placed him -- along with his brother -- in the vicinity of the shootings moments after the events charged."  R&R at 65. Krinsky testified at the Section 440 hearing that he viewed this alibi defense as "walking on a tightrope" because his client's story placed him dangerously close to the scene of the shootings. H. Tr. at 175-76.  However, the fact remains that the jury heard Ramon's videotaped statement to police, in which he admitted picking Reynaldo up after the shootings and fleeing with him to the Dominican Republic.  Therefore, the jury was already aware that Ramon admitted being in the neighborhood, and that he helped his brother to escape the scene of the crime.[30]  Additional alibi evidence would have reinforced Ramon's admission to police, but it also could have generated doubts about whether he was guilty of the crimes for which he was convicted.  In light of the fact that Ramon's admission was already before the jury, counsel's failure to present this alibi defense left petitioner vulnerable to the prosecution's most severe charges, without providing any significant benefits to his defense.

---

[30] Ramon also claimed that Reynaldo had told him that the shootings were in self-defense.  See June 20, 1989 Interview Tr. at 3 ("Q: What did your brother tell you what happened?  [Ramon:] Say somebody tried to shoot him, so he shoot him back.").

Petitioner's innocence or guilt remains shrouded in doubt.[31]
However, our legal system requires the prosecution to prove its
claims beyond a reasonable doubt.  A criminal defendant is
entitled to avoid conviction at trial if he can present evidence
to the jury that necessitates a finding of reasonable doubt.  If
trial counsel's errors prejudiced petitioner, by preventing him
from placing evidence before the jury that would reasonably have
prompted such doubt, petitioner is entitled to habeas relief.

The facts of this case show that counsel's errors created
such prejudice.  As defense counsel testified, his trial strategy
relied on casting doubt on the prosecution's case, rather than
trying to convince the jury of an alternative version of events.
See H. Tr. at 167-68.  Although petitioner's alibi was before the
jury, through his videotaped testimony, it was entirely
uncorroborated.  It is reasonable to expect a jury to discount an
uncorroborated and self-serving statement offered by a defendant,
and to give greater weight to an alibi corroborated by a witness
whose credibility is not initially suspect.  Moreover, this
corroborating evidence would not have been merely cumulative, as

_____

[31] As noted above, although no evidence was presented at trial
about the planning of these shootings, Anthony Guzman appears to
have told federal prosecutors in 1989 that Wilfredo Garcia was
"set up" in a "fight over crack."  However, as noted above, the
notes of Guzman's statement reference only a single Dominican.
The record raises a number of unanswered questions about the
circumstances surrounding these shootings.

indicated by the state court in its ruling, because it would have
significantly strengthened the alibi claims already before the
jury through petitioner's videotaped statements.  See Bohan v.
Kuhlmann, 234 F. Supp. 2d 231, 251, 280 (S.D.N.Y. 2002) (finding
that corroborating evidence was not cumulative where it might
have bolstered petitioner's alibi claims).

Accordingly, counsel's failure to investigate this possible
corroborating evidence is sufficient to show prejudice.  See
Lindstadt, 239 F.3d at 204-05 (reversing denial of writ after
finding prejudice where trial counsel failed to investigate
evidence that could have corroborated defendant's alibi claims,
and where prosecution case rested on only two eyewitnesses and
limited corroborating evidence); Brown v. Myers, 137 F.3d 1154,
1157-58 (9th Cir. 1998) (reversing denial of writ after finding
prejudice under Strickland standard, because habeas petitioner's
counsel had failed to investigate and call corroborating
witnesses at trial, thereby diminishing the credibility of
defendant's own testimony at trial); Schulz, 528 F. Supp. 2d at
101 (finding prejudice where defense counsel failed to present
alibi evidence, and conviction rested on testimony of only two
eyewitnesses).  Cf. Bohan, 234 F. Supp. 2d at 252 (granting writ,
although "there was more than sufficient evidence presented at
trial for a rational juror to conclude that [petitioner]

48

committed the murder in question," because when constitutional errors at trial "create grave doubts about their effect on a petitioner's guilty verdict, a federal court has an obligation to grant a writ of habeas corpus" (citing O'Neal v. McAninch, 513 U.S. 432, 436-37 (1995))).

**c.    Trial Counsel Failed to Offer Wilfredo Garcia's DD-5 Statement as Evidence**

Petitioner has also claimed that Krinsky was ineffective for failing to introduce the statement given by Wilfredo Garcia to police before he died, in which Wilfredo identified Reynaldo Espinal as his shooter, and did not make any mention of Ramon Espinal.  Judge Mann concluded that trial counsel's failure to introduce the statement of Wilfredo Garcia, as given to police during his hospitalization, was not erroneous because this statement was inadmissible hearsay, and because it would not have prevented a jury from finding Ramon guilty as an accomplice.  R&R at 68-72.  Judge Mann correctly observes that this statement was not a dying declaration, because it was given while Wilfredo expected to recover.  See R&R at 68-70.  This statement also was not admissible against interest because Wilfredo's description of the shooting was not against his penal interest.  See id. at 70-71.  Nonetheless, if trial counsel had attempted to offer this statement, it should have been found admissible under New York's "constitutional" exception to the hearsay rule.

49

New York's rules of evidence do not include an express

"residual" exception comparable to Rule 807 of the Federal Rules

of Evidence.  Nonetheless, New York courts have recognized a

constitutionally-based exception to the hearsay rule for certain

evidence offered by criminal defendants that provides equivalent

circumstantial guarantees of trustworthiness.  See People v.

Robinson, 89 N.Y.2d 648, 654, 657 N.Y.S.2d 575, 579, 679 N.E.2d

1055, 1059 (1997) (allowing defendant, on constitutional

principles of due process, to introduce grand jury testimony of

unavailable witness, even though such testimony did not fall

within recognized hearsay exception); People v. James, 242 A.D.2d

389, 389, 661 N.Y.S.2d 273, 273-74 (2d Dep't 1997) (same); People

v. Esteves, 152 A.D.2d 406, 413, 549 N.Y.S.2d 30, 35 (2d Dep't

1989) (recognizing that the United States Constitution may

require courts to admit exculpatory hearsay statements that do

not fall within any recognized hearsay exception).  See also

Morales v. Portuondo, 154 F. Supp. 2d 706, 724-25 (S.D.N.Y. 2001)

(comparing New York's constitutional hearsay exception with the

federal residual hearsay exception).  In Robinson, 89 N.Y.2d at

650, 657 N.Y.S.2d at 576, 679 N.E.2d at 1056, the New York Court

of Appeals held that a defendant's constitutional right to due

process permitted the admission of grand jury testimony at trial

where "the declarant has become unavailable to testify at trial"

and "the hearsay testimony is material, exculpatory and has sufficient indicia of reliability." One federal court has summarized the three-factor test from <u>Robinson</u> to conclude that hearsay testimony may be admissible under New York law where: "(1) the testimony was 'vital' to the defense; (2) the witness who gave the testimony was unavailable; and (3) the testimony bore sufficient indicia of reliability." <u>Morales</u>, 154 F. Supp. 2d at 725.

If Ramon had offered Wilfredo's statement to police at trial, it would have met all three of these requirements. First, this statement would have been "vital" to Ramon's defense, as it would have been offered as corroborating evidence to support his theory that only Reynaldo was at the scene of the crime when the shooting occurred. The prosecution's theory of this case, as explained to the jury during summation, was that Wilfredo knew the Espinal brothers, and that this shooting was motivated by a dispute between Wilfredo and the Espinals over a drug dealing corner. <u>See</u> Tr. at 682. The prosecution also argued that Ramon Espinal was armed and standing about two feet behind and to the right of his brother Reynaldo when the shooting began; that both Ramon and Reynaldo were easily visible and identifiable by witnesses; and that Ramon had a "clear line of fire" toward the shooting victims. <u>See</u> <u>id.</u> at 701-02, 706. In his hospital

interview with police, however, Wilfredo did not mention Ramon
Espinal at all.  Wilfredo only told police about a single
shooter, who was "from the area, and known to [Wilfredo] by
sight."  Second Look Rep. Ex. DD-5-17.  Wilfredo identified this
shooter out of a photo line-up as Reynaldo Espinal.  <u>See</u> <u>id.</u>
Wilfredo also indicated that Reynaldo "ran down South 1 St."
after the shooting.  <u>Id.</u>  In light of the prosecution's evidence
that Wilfredo knew the Espinal brothers, it is reasonable to
assume that Wilfredo would have identified Ramon to police, and
not just Reynaldo, if Ramon had been present as a second gunman
and getaway driver.  In other words, there is no reason to
believe that Wilfredo would have implicated only one of the
Espinal brothers if both brothers had confronted him that night.
Accordingly, trial counsel could have used Wilfredo Garcia's DD-5
report to cast doubt on whether Ramon was actually present at
these shootings.

    The R&R observed that Wilfredo's statement "identified
Reynaldo as the principal shooter, but did not undermine the
prosecution's theory that petitioner acted as his accomplice."
R&R at 71-72.  However, the ambiguous nature of Wilfredo's
statement does not mean that it has no value for the defense, or
that it might not help the defendant create doubt about the
prosecution's allegations.  Evidence need not clearly exonerate a

defendant to be vital to his defense. In light of the need for petitioner to corroborate his alibi claims, Wilfredo's statement would have been sufficiently vital that petitioner had a due process right to introduce it at trial, even if a reasonable juror could also have concluded that Wilfredo's statement fit the prosecution's theory of the case.

Wilfredo's statement also fulfills the other requirements for this hearsay exception. Wilfredo was unavailable, as he died within days of giving this statement in the hospital. Finally, this statement bore sufficient indicia of reliability. The details of this statement, particularly Wilfredo's identification of Reynaldo as his shooter, appear consistent with the other evidence in the record, and suggest that he was likely telling the truth to police.

The failure to introduce this statement, like the failure to investigate the David Garcia DD-5, is, indeed, troubling. It must be remembered that the prosecution, during closing argument, asked the jury to draw the inference that Ramon was not merely armed and present at the scene of the shootings, but that Ramon actually fired his gun at the victims. See Tr. at 705-07. Therefore, any evidence that would support Ramon's claim that there was a single shooter, and that he was not present at the shootings, would surely have aided his defense. A juror could

reasonably conclude that Ramon's absence from Wilfredo's statement was evidence that Ramon was also absent from the scene of these shootings. At the very least, Wilfredo's failure to implicate Ramon seems inconsistent with the prosecution's theory that Wilfredo was feuding with both Reynaldo and Ramon Espinal, and that Ramon was standing only two feet away from Reynaldo during the shootings. Although the prosecution could have argued that Wilfredo's statement did not exonerate Ramon, this evidence might have helped to create doubt in the minds of the jury.

It is uncertain whether introducing this statement, on its own, would have changed the outcome of this trial. However, a Strickland analysis requires consideration of the cumulative effect of counsel's errors at trial. See Lindstadt v. Keane, 239 F.3d 191, 194 (2d Cir. 2001); Schulz v. Marshall, 528 F. Supp. 2d 77, 92 (E.D.N.Y. 2007). Wilfredo's statement could have had an impact as part of a more aggressive alibi defense that included other corroborating evidence such as the David Garcia DD-5 report. Accordingly, the failure to press for the admission of this statement at trial, in light of counsel's principal error, also fell below the standards required by Strickland.

**d.    Trial Counsel's Decision Not to Cross-Examine Jose Cortes on His Prior Statement Also Supports the Prejudice Portion of Petitioner's _Strickland_ Claim.**

Petitioner also objects to the R&R on the grounds that trial counsel was ineffective for failing to impeach Jose Cortes with his prior statements.  Pet.'s Obj. at 29.[32]  Petitioner claims that Cortes's hospital statement to police on June 23, 1988 (as summarized by Detective Chmil in the DD-5 report) is inconsistent with his trial testimony because it failed to mention a second gunman or a red car.  Petitioner argues that "[b]ringing out these inconsistencies was critical to proving that Cortes' testimony was a recent fabrication intended to bolster the unreliable testimony of Anthony Jose Garcia."  Pet.'s Obj. at 31.

Petitioner is correct that the hospital DD-5 report does not include many of the incriminating details included in Cortes's trial testimony.  The entire account given by the Cortes DD-5 report is as follows:

> Just before the shooting I was walking up South 1st St.
> with Wilfredo.  I was in front of Wilfredo.  As we were
> coming to the corner of Bedford Ave. I heard gunshots
> coming from behind me.  As I bent down to help him up I
> saw a guy firing a gun in my direction.  I was then hit
> in the hip.  Wilfredo got up and we started to run up
> Bedford Ave. towards South 2 St.  I never saw the young

---

[32] Petitioner wrongly suggests that Jose Cortes was a "new witness" at the retrial, who was introduced to corroborate Anthony Garcia's testimony.  Pet.'s Obj. at 27, 31-32.  Cortes, however, provided the same testimony about the shootings at Ramon's first trial.  <u>See</u> Jan. 28, 1991 Tr. at 542-46.

boy who was shot.  At the corner of South 2 St. &
Bedford we both fell down.  The police came a few
minutes later.  I did not see where the shooter ran
after the shooting.

Cortes then picked a photo of Reynaldo Espinal out of a set of
six photos by stating that "this guy looks like the shooter but I
am not positive."  Second Look Rep. Ex. DD-5-18.

At trial, Cortes offered more details which - most
importantly - placed a second individual (presumably Ramon) at
the scene of the shooting.  Cortes testified that while Wilfredo
was inside a store on South 1st Street, "[t]wo individuals
arrived.  They came out of a car.  They passed in front of me.
They sat on top of a car in front of the place where Wilfredo
was."  Tr. at 582.  Cortes testified that these individuals spoke
with Wilfredo when he exited the store, although he could not
hear the conversation.  Then, when Wilfredo started to walk away,
"one of the two people that were there came down from the top of
the car, took out a pistol or revolver, I don't know, and he ran
some steps to the back of Wilfredo and fired."  Id.  Cortes
testified that the gunman's car was a red Trans Am.  Id.  Cortes
did not testify that he saw the gunman or the second individual
depart from the scene.

The DD-5 report does not in any way implicate Ramon, whereas
at trial Cortes testified that he saw two individuals arrive
together in a red Trans Am.  In addition, the DD-5 report

suggests that Cortes initially told police that the shooting began while he and Wilfredo were walking together away from the gunman, whereas at trial he testified that he saw the shooting begin after an initial encounter between Wilfredo and the gunman. Confronted with this earlier statement, a juror could conclude that Cortes had embellished his initial testimony to implicate Ramon by tracking the version of events offered by the other prosecution witnesses.

It is somewhat curious that Krinsky did not cross-examine Cortes on his earlier statement to police at the retrial, given that he did ask Cortes about his hospital statements to police at the first trial. <u>See</u> Jan. 28, 1991 Tr. at 579-85. For example, at the first trial, Krinsky used his cross-examination to question whether Cortes had mentioned anything in his hospital statement to police about the presence of two individuals and a red car. <u>See</u> <u>id.</u> at 585.[33]

However, under <u>Strickland</u>, "a court must indulge a strong presumption" that a challenged action by counsel "might be

---

[33] [Krinsky]:    You never -- you never mentioned or told Police
                   Officer Bradford or Detectives Vitulli or Chmil
                   anything about two guys sitting on a car; did you?
     [Cortes]:     I don't remember.
      Q:           You never told Detective Chmil or Detective
                   Vitulli anything about anyone arriving in some red
                   car; did you?
      A:           I don't remember.

57

considered sound trial strategy." <u>Strickland</u>, 466 U.S. at 689 (internal quotation omitted).  Unlike the failure to use the redacted DD-5 report, which was based on a lack of investigation, the decision not to pursue this line of questioning at the retrial, after raising these questions at petitioner's first trial, must be presumed to be a conscious decision.  Courts are generally instructed not to "second-guess" such decisions.  <u>Id.</u>

Moreover, on its own, counsel's failure to cross-examine Cortes based on his hospital statements was not as prejudicial as petitioner claims.  Confronted with this cross-examination, a juror could find that Cortes's trial testimony was not fundamentally inconsistent with his earlier statement to police, but merely more detailed.  Critically, the purported inconsistencies largely do not consist of facts that <u>changed</u> between Cortes's earlier account and his trial testimony, but facts that were <u>absent</u> from the earlier statement.  A juror could reasonably conclude that the DD-5 statement only recounted what Cortes saw after the shooting started, while his testimony filled in additional details about what he saw before the shooting began.

In addition, petitioner exaggerates the statement given in the Cortes DD-5.  This DD-5 reports that Cortes "did not see where the shooter ran after the shooting."  Petitioner claims,

based on this, that "Cortes' initial statement . . . clearly
states that the lone gunman was on foot and ran away from the
scene, although the witness did not know in which direction."
Pet.'s Obj. at 30.  But the DD-5 merely indicates that Cortes,
who was running down Bedford Avenue from South 1st to South 2nd
after being shot, did not see which way the gunman ran after the
shooting ended.  It must be remembered that Cortes testified at
trial that the gunman and his accomplice were waiting for
Wilfredo on top of a car parked outside a store, and <u>not</u> on top
of the red Trans Am in which they arrived, which was parked
further down the block.  Cortes's statement that he did not see
where the gunman ran after Cortes and Wilfredo turned down
Bedford Avenue to escape is not necessarily inconsistent with
this testimony.  A juror could reasonably conclude that both the
DD-5 and the trial testimony were consistent with the story that,
while Cortes and Wilfredo were trying to escape toward South 2nd
Street after being shot, the gunman ran in a different direction
toward the red Trans Am.  There is no reason that a jury,
reviewing the earlier DD-5 in light of Cortes's trial testimony,
must conclude that Cortes had changed his earlier story to
police, or that Cortes had previously told investigators that a
lone gunman was escaping the scene on foot.  Accordingly,
petitioner's claim that bringing this prior statement to light,

on its own, would have led to an acquittal, <u>see</u> Pet.'s Obj. at
31-32, is exaggerated.

Nonetheless, <u>Strickland</u> requires a court to consider the
totality of the evidence.  <u>Strickland</u>, 466 U.S. at 695.  As
already discussed, counsel's failure to investigate evidence that
might have corroborated petitioner's alibi defense was error of
constitutional importance.  Cross-examining Cortes about his
hospital statement to police could have further bolstered
petitioner's alibi defense.  While this cross-examination alone
would not have swayed a reasonable juror, when combined with
David Garcia's account, it might have added to doubts about
petitioner's presence at the shootings.  Accordingly, Krinsky's
decision to abandon this line of cross-examination at retrial
supports petitioner's <u>Strickland</u> claims, by showing how the
failure to pursue corroborating evidence had a pervasive effect
on counsel's treatment of the evidence at trial.


**(3)**

**The State Courts Erred in Their Analysis of the DD-5 Report
Even Under the Deferential Standards of AEDPA**

State courts considered this redacted DD-5 report, and trial
counsel's failure to investigate it, when reviewing petitioner's
first and third Section 440 motions in 1998 and 2004
respectively.  On both occasions, the state courts found no merit

to petitioner's claims.[34] Under the Antiterrorism and Effective
Death Penalty Act ("AEDPA"), a federal court may not issue a writ
of habeas corpus on a claim that was adjudicated on the merits in
state court proceedings "unless the state court adjudication
'resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States,' or 'was
based on an unreasonable determination of the facts in light of
the evidence presented in the State court proceeding.'" <u>Murden
v. Artuz</u>, 497 F.3d 178, 197 (2d Cir. 2007) (quoting 28 U.S.C. §
2254(d)(1)-(2)) (citations omitted); <u>Lindstadt v. Keane</u>, 239 F.3d
191, 198 (2d Cir. 2001).

However, the state courts' consideration of the DD-5 report
cannot be sustained even under this deferential standard.  The
state court's 1998 decision fails both because its ruling on
petitioner's ineffective assistance of counsel claim was an
unreasonable application of <u>Strickland</u> and because that ruling
was based on an unreasonable determination of the facts in light
of the evidence presented.  <u>See</u> <u>Lindstadt</u>, 239 F.3d at 205.  The
state court's 2004 decision also fails principally because its
refusal to grant the defendant access to an unredacted copy of

---

[34] Neither party appears to dispute that petitioner's DD-5
claims were decided on the merits.  Accordingly, we defer to the
state courts under the provisions of the Antiterrorism and
Effective Death Penalty Act.

the DD-5 report under <u>Brady</u> was based on an unreasonable

determination of the facts.  <u>See</u> <u>Brady v. Maryland</u>, 373 U.S. 83

(1973) (finding that a defendant has a constitutional right be

informed of exculpatory evidence known to the state).

a.   **The State Court's 1998 Ruling on Petitioner's Ineffective
     Assistance of Counsel Claim Unreasonably Applied Supreme
     Court Precedent and Was Based on an Unreasonable
     Determination of the Facts.**

In his April 13th, 1998 decision, Justice Barasch rejected

petitioner's ineffective assistance of counsel claim.  <u>See</u> RX-H

at 3-4.  As a preliminary matter, it is worth noting that, while

Justice Barasch's opinion must be given deference under AEDPA, it

is far from clear that he actually gave close consideration to

petitioner's DD-5 claim.  At the January 14th, 1998 hearing on

the motion, petitioner's counsel questioned Krinsky regarding the

DD-5 report, but Krinsky testified that he had no recollection of

receiving it.  H. Tr. at 179-87.  When petitioner's counsel

attempted to press Krinsky further on his failure to seek the

identity of the witness named in the DD-5 report, Justice Barasch

sustained objections to the line of questioning on the grounds

that Krinsky had no recollection of receiving the report.  <u>See</u>

<u>id.</u> at 180-86.  In addition to cutting off questioning on the

subject of the DD-5 report at the hearing, the structure Justice

Barasch's opinion suggests that he never focused on the DD-5

claim.  After stating that he found the petitioner's ineffective

assistance of counsel claim "totally devoid of merit[,]" Justice

Barasch enumerated three decisions Krinsky made that Justice

Barasch felt were based on "sound, well-reasoned trial strategy."

RX-H at 3-4.  This list did not include Krinsky's failure to seek

the identity of the witness mentioned in the DD-5 report.  RX-H

at 4.  Furthermore, Justice Barasch noted that his decision to

deny the petitioner's motion was made "[i]n view of the foregoing

discussion," a discussion that did not include any mention of the

DD-5 claim.  It, therefore, appears that Justice Barasch may have

dismissed the DD-5 claim out of hand, if he ever focused on it at

all.  This is worth noting even if it does not change the fact

that Justice Barasch's opinion is entitled to AEDPA deference.

Cf. Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001) (noting

that a state court opinion need not specifically discuss an issue

to receive AEDPA deference).

        Turning to the substance of the petitioner's claim, the

state court's decision fails even with AEDPA deference because it

was an unreasonable application of Supreme Court precedent.  See

Gerstein v. Senkowski, 426 F.3d 588, 607 (2d Cir. 2005)

(explaining that under AEDPA a state court's application of

Supreme Court precedent must be objectively unreasonable, and

that "the state court's application of federal law must reflect

some increment of incorrectness beyond error, although that

increment need not be great." (internal quotations and citations omitted)); <u>Lindstadt</u>, 239 F.3d at 205; <u>Sellan</u>, 261 F.3d at 311-12. The state court was well within the bounds of <u>Strickland</u> when it concluded that trial counsel was not constitutionally ineffective for deciding not to call Torres or Edwin Rodriguez as witnesses, and for not introducing Anthony Garcia's prior statement that Ramon was a shooter in this incident. Krinsky made these decisions based on his well-reasoned opinion that introducing such evidence could do more harm than good to his client. These types of strategic decisions are not to be second-guessed under <u>Strickland</u>. <u>See</u> <u>Strickland</u>, 466 U.S. at 689; <u>United States v. Best</u>, 219 F.3d 192, 201 (2d Cir. 2000). The state court was also correct in observing that Krinsky was a vigorous and aggressive advocate for his client at trial.

But the fact remains that Krinsky failed to investigate a crucial piece of evidence, and this error led him to abandon a potentially viable alibi defense. Courts interpreting <u>Strickland</u> have found that this type of error clearly renders trial counsel ineffective under <u>Strickland</u>, in light of the prejudice suffered by petitioner at trial. <u>See</u> <u>Lindstadt</u>, 239 F.3d at 204-05. Accordingly, the state court's decision to deny petitioner's claim for relief involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of

the United States. 28 U.S.C. § 2254(d)(1). See Lindstadt, 239
F.3d at 205 (finding that state court unreasonably applied
Strickland where counsel was ineffective for, among other
reasons, failing to make reasonable investigations); Schulz, 528
F. Supp. 2d at 99 (same). See also Henry v. Poole, 409 F.3d 48,
72 (2d Cir. 2005) (holding that a state court unreasonably
applied Strickland when it ignored the probable impact of
counsel's errors, and instead relied on a finding that counsel
provided meaningful representation overall).

In addition, the state court's ruling was based on an
unreasonable determination of the facts. See Murden, 497 F.3d at
197. Petitioner claimed in his first Section 440 motion that his
trial counsel was ineffective for failing to investigate and
pursue his alibi claims. He specifically claimed that trial
counsel was ineffective for failing to investigate the redacted
DD-5 report as corroborating evidence. The state court should
have recognized that this redacted DD-5 report -- which remains
the only piece of contemporaneous evidence in the record to
corroborate petitioner's alibi claims -- was a critical piece of
evidence, and that trial counsel's failure to investigate this
piece of evidence was unreasonable under the circumstances.

Admittedly, petitioner's counsel at the Section 440 hearing,
Daniel Felber, wrongly assumed that the witness in this redacted

report was Anthony Guzman.  See H. Tr. at 185 (Felber's assertion that "we know exactly who the" witness in the redacted report was, because "[i]t says he's the one who retrieved the gun"). Felber's mistake was understandable, and was caused by the prosecution's decision to provide petitioner with only a redacted copy of this potentially exculpatory report prior to trial.  But this error had led petitioner to assume that the redacted report was only valuable as evidence to corroborate Guzman's testimony.

     Nonetheless, Justice Barasch knew that petitioner's counsel was jumping to unsupported conclusions.  When Felber asserted that he knew the identity of this witness, Justice Barasch rightly responded that "I don't know who it is. . . . [W]e only know it's not Mr. Torres, because Mr. Torres testified this morning that he never spoke to the police."  Id. at 185-86.  The court, however, failed to correct petitioner's mistake, or to recognize that the identity of this witness was a critical fact that remained hidden to petitioner.[35]

     In short, the state court recognized the uncertainty and confusion surrounding this redacted police report.  But the court

---

[35]  It is not clear from the record whether Justice Barasch ever saw an unredacted version of the David Garcia DD-5 report. However, it appears that petitioner's counsel did not request an unredacted copy of this DD-5 during these state court proceedings, which were limited in scope to the issue of whether Anthony Torres's testimony was "newly discovered evidence" pursuant to New York Criminal Procedure Law § 440.10(1)(g).  See H. Tr. at 4-6.

misunderstood the facts of this case as they pertained to the investigation of available alibi evidence.  That misunderstanding caused the court, in turn, to fail to recognize the magnitude of counsel's error in foregoing an investigation into whether these materials could have corroborated his client's alibi claims.  Accordingly, the state court's decision was based on a misunderstanding of the available evidence, and is not entitled to additional deference under AEDPA on this issue.

**b.   The State Court's 2004 <u>Brady</u> Ruling Was Based on an Unreasonable Determination of the Facts**

The state court revisited this issue in 2004 when reviewing petitioner's third Section 440 motion, which again raised claims of ineffective assistance of counsel for failing to pursue petitioner's alibi defense.[36]  In the course of these proceedings, petitioner sought an unredacted copy of the DD-5 report in question, arguing that he had a right to exculpatory evidence.

New York State Supreme Court Justice Silverman examined this report <u>in camera</u> before rejecting petitioner's request.  In his May 20, 2004 decision, Justice Silverman explained:

The Court has reviewed <u>in camera</u> said police report and has determined that Guzman is not the witness whose

---

[36] The state court's 2004 decision also considered petitioner's DD-5 claim but concurred with the prior ruling that it was not meritorious and further found it procedurally barred.  <u>See</u> May 20, 2004 Order at 6.

statement was recorded in the police report dated June
22, 1989.  Moreover, the redacted police report does
not support defendant's alibi.  The witness does not
state he was drag racing with defendant nor does the
report even mention defendant's name.  The witness
merely states that at some unspecified time in the
evening of the date in question he saw a red Fire-Bird
pull up and defendant's brother whose hand was bleeding
got into the car.  He did not see the driver.  Contrary
to defendant's assertions, the police report does not
support his claim that he was with the witness at the
time of the shooting.  At most the report is cumulative
to the alibi defense with respect to facts occurring
after the shooting.  The evidence would not have had a
significant impact at trial.  For these reasons the
Court is denying defendant's request for an unredacted
copy.

This ruling represents an unreasonable assessment of the facts of

this case.

First, the state court erred by failing to recognize that

this report was potentially exculpatory evidence that had to be

produced.  See Brady v. Maryland, 373 U.S. 83 (1963); DiSimone v.

Phillips, 518 F.3d 124, 126 (2d Cir. 2008).  The court's error,

and its refusal to reveal the identity of the witness in the DD-5

report, grew from its assumption that the report was only

relevant if it corroborated Guzman's affidavit.  The court's lack

of receptivity, once again, may have stemmed at least partly from

defense counsel's faulty assumption that the DD-5 was from an

interview with Guzman, which the court knew was not the case.

See May 20, 2004 Order at 5.  Nonetheless, as the Supreme Court

observed, under Brady a defendant has the right to be informed of

exculpatory information known to the State.[37]  There should be no
doubt that, at the very least, this report was very material to
petitioner's alibi claims.  Moreover, given the lengthy amount of
time that has passed since the events in question, any interest
that the State might have once had in preserving the secrecy of
this witness's name had certainly faded, and was now outweighed
by petitioner's right to investigate his claims fully.

Second, the state court unreasonably assessed the facts of
this case by concluding that the redacted report did not support
petitioner's alibi claims.  Although the report does not mention
the drag racing story, or identify either of the Espinal brothers
by name, it is consistent with Ramon's claims that he encountered
Reynaldo while driving his car and was not present for the
shootings.  This DD-5 does not support all of petitioner's

---

[37] Although the right to evidence under <u>Brady</u> does not extend to
a prisoner's post-conviction proceedings, the State retains an
ethical (if not a constitutional) obligation to provide
information that casts doubt on the correctness of a conviction.
<u>See</u> <u>Imbler v. Pachtman</u>, 424 U.S. 409, 427 n.25 (1976); <u>Grayson v.
King</u>, 460 F.3d 1328, 1337 (11th Cir. 2006).  In addition, in the
related context of newly-available DNA evidence, the Second
Circuit recently held open the question of whether the "residual
post-conviction liberty interest" held by prisoners "encompasses
an interest in accessing or possessing potentially exonerative
biological evidence." <u>McKithen v. Brown</u>, 481 F.3d 89, 106-07 (2d
Cir. 2007).  On remand, it was found that "the Due Process Clause
of the Fourteenth Amendment grants a convicted offender access to
physical evidence for the purpose of DNA testing if it can be
performed with negligible cost to the state and exculpatory
results would undermine confidence in the outcome of trial."
<u>McKithen v. Brown</u>, No. 02-CV-1670, 2008 U.S. Dist. LEXIS 55094,
at *2 (E.D.N.Y. July 21, 2008).

factual claims and may be subject to different interpretations, but there is no way a court could reasonably conclude that this DD-5 report entirely fails to corroborate petitioner's version of events.

In short, the state court's 2004 finding that "the redacted police report does not support defendant's alibi" is not entitled to deference under AEDPA, because it was "'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" <u>Murden v. Artuz</u>, 497 F.3d 178, 197 (2d Cir. 2007) (quoting 28 U.S.C. § 2254(d)(2)). Therefore, the state court's denial of claims relating to that report -- including petitioner's request for an unredacted report and his claims of ineffective assistance -- do not prevent petitioner from receiving such relief under federal law.

## Conclusion

Ramon Espinal's alibi has remained consistent since his first interview with police on the night of his arrest on June 19, 1989. He claims to have been out driving on the night of these shootings and to have been drag racing with Anthony Torres and Anthony Guzman when he encountered his brother Reynaldo. Both Torres and Guzman have come forward, although only years later, with stories that corroborate Ramon's alibi. Their story is largely consistent with the DD-5 of David Garcia taken on June 22, 1989, which bears significant signs of being a credible hearsay statement. This alibi evidence, taken as a whole, casts some doubt on whether Ramon was actually at the scene of the shootings, as argued by the prosecution at trial.

The record shows that petitioner's trial counsel, Barry Krinsky, was a vigorous and tenacious advocate for his client. Most of the decisions that he made are consistent with a sound trial strategy. Krinsky did not err by refusing to call Torres as a witness, recognizing that Torres was an unpredictable and uncooperative witness with a significant criminal background. He also did not err by failing to discover Guzman's testimony, as Guzman had disappeared into the federal witness protection program at the time of trial.

However, trial counsel made a serious error when he failed to investigate whether the redacted DD-5 report of David Garcia could provide critical corroboration to support his client's alibi claims. This error clearly falls below the requirements of Strickland. There were other errors, namely, failure to use other available evidence, such as the hospital statements of shooting victims Wilfredo Garcia and Jose Cortes, to support petitioner's alibi and to cast doubt on the prosecution's theory of the case. These latter errors are not of themselves of constitutional dimension, but weighed together with the failure to investigate Ramon's alibi claims fully, could have provided additional doubt into the mind of a reasonable juror, and, therefore, undermines confidence in the validity of the trial's outcome. Finally, the state court rulings to the contrary do not prevent the granting of habeas relief, because, to the extent that they addressed the specific claims, they were based on unreasonable assessments of the law and facts.

Accordingly, Ramon Espinal's petition for a writ of habeas corpus is granted. Respondent and the state are ordered to release Ramon Espinal from custody unless the state provides him with a new trial within ninety (90) days of the date of entry of this order.


Dated: Brooklyn, New York
       December 5 , 2008


                              SO ORDERED:


                              _____/s/_____
                              David G. Trager
                              United States District Judge